1

2

3

4

5

6

7

8                     UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,               No.  2:14-cr-00342-KJM-1

12                 Plaintiff,

13          v.                               ORDER

14   JAIRO BUENROSTRO CORNEJO,

15                 Defendant.

16

17          Relying in large part on the Supreme Court's relatively recent decision in

18   *Rodriguez v. United States*, ___ U.S. ___, 135 S. Ct. 1609 (2015), defendant Jairo Cornejo moves

19   to suppress physical evidence seized and statements made on December 13, 2014 following a

20   traffic stop.  The government opposes the motion.  The court heard testimony at an evidentiary

21   hearing on September 23, 2015 and March 29, 2016, and heard argument on August 12, 2015 and

22   June 8, 2016.  At each hearing, Richard Bender appeared for the government and Kelly Babineau

23   appeared for Cornejo.  As explained below, the court GRANTS IN PART defendant's motion.

24   I.        PROCEDURAL BACKGROUND

25          On December 15, 2014, the government filed a criminal complaint, alleging that

26   defendant had possessed with the intent to distribute methamphetamine and heroin under

27   /////

28   /////

21 U.S.C. § 841(a)(1).[1]  ECF No. 1.  On December 18, 2014, a grand jury indicted defendant on two counts, consistent with the complaint's allegations.  ECF No. 5.  Cornejo entered a not guilty plea on December 30, 2014.  ECF No. 8.  On June 17, 2015, defendant moved to suppress evidence and requested an evidentiary hearing.  ECF No. 28.  The government opposed the motion, ECF No. 32, and Cornejo replied, ECF No. 33.  On August 12, 2015, the court held an initial hearing and determined an evidentiary hearing was necessary to resolve factual disputes.  *See* ECF No. 35.

The court completed the first day of the evidentiary hearing on September 23, 2015 and, due to various scheduling conflicts and requests for continuances, completed the second day of the evidentiary hearing on March 29, 2016.  ECF Nos. 38 & 66.  Shasta County Deputy Sheriff Jesse Gunsauls, one of the two deputies involved in the traffic stop, testified for the government.  Jeff Dalton, an employee with Enterprise Car Rental's Sacramento legal compliance office, and Laurie Sowder, a training manager at a consolidated 911 dispatch center in Shasta County, testified for defendant.  The following exhibits were admitted into evidence:

- a dash cam video of the traffic stop (Ex. 1; Bates No. 0115);
- a photograph of Cornejo's rental car showing the position of the deputies' vehicles at the time of the stop, after Deputy Hughes arrived (Ex. 2; Bates No. 050);
- photographs of the passenger area and passenger side floor of Cornejo's rental car at the time of the stop (Exs. 3, 3a; Bates Nos. 0033, 0034);
- a photograph of Cornejo's Washington state driver's license (Ex. 4; Bates No. 0081);
- Cornejo's rental car agreement and photographs of the rental agreement (Exs. 5, 6a, 6b, 6c; Bates Nos. 0016, 0060, 0061, 0063);

---

[1] Section 841 states, "[I]t shall be unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance . . . ."  21 U.S.C. § 841(a)(1).

- a photograph of the warning citation completed by the deputies for Cornejo's alleged traffic violation (Ex. 7; Bates No. 0011); and

- the Shasta County Sheriff's dispatch logs for the incident (Ex. 15; Bates Nos. 00128, 00130–33).

The parties submitted closing arguments in the form of post-hearing briefs. ECF Nos. 76 & 77. The court heard oral argument on June 8, 2016. The parties then filed supplemental authorities in support of their positions, ECF Nos. 79 & 80, and the motion was submitted on June 15, 2016.

II.     RELEVANT FACTS

A.     Initial Stop

On Saturday, December 13, 2014, at or about 9:09 a.m., Deputy Gunsauls was traveling north on Interstate I-5 near Redding, California. Dashboard Video 9:08:52,[2] Ex.1 ("Vid."); Evid. Hr'g Tr. 29, ECF Nos. 49 & 72 ("Tr."); *see* Investigation Report 5, Mot. Suppress Ex. A, ECF No. 28-1 ("Rep.").[3] Gunsauls was driving a marked Chevrolet Tahoe as a K-9 unit. Tr. 24; *see* Rep. 1. His patrol vehicle was equipped with a radar system and an audio/video recording system. Tr. 24–25; *see* Rep. 1. At the time, Gunsauls was assigned to the domestic highway enforcement unit of the Shasta County Sheriff's Office, an intelligence unit that has specialized training in counter terrorism and counter smuggling. Tr. 13, 84. The unit does high

---

[2] The time stamps cited in this order are taken from the closed captioning on the government's CD exhibit of the video, Ex. 1. Cornejo does not contest the accuracy of these time stamps.

[3] In his post-hearing brief, defendant claims Sowder's testimony regarding the dispatch logs establishes that a second law enforcement agency, the Shasta Interagency Narcotics Task Force ("SINTF"), first contacted dispatch and ran Cornejo's license plate at 9:15 a.m., and that Gunsauls was not dispatched until 9:18 a.m. ECF No. 76 at 13 n.1. This contention is not supported by Sowder's testimony or the other evidence before the court. The video taken from Gunsauls' dashboard shows Gunsauls initiating the traffic stop at 9:08:52 a.m. Although the parties have not fully explained the information in the dispatch logs, and the logs do not identify the officers' names, Tr. 228, it appears most likely from the dashboard video and Gunsauls' testimony that Gunsauls was the officer who first contacted dispatch and ran Cornejo's license plate at 9:15 a.m., and then Deputy Ray Hughes was the officer who was dispatched at 9:18 a.m. This conclusion is further supported by Gunsauls' testimony that he supplements SINTF. Tr. 86, 228.

3

volume traffic stops between Highway 36, Highway 299, Highway 44, and Interstate 5 within

Shasta County, and Gunsauls' primary duty is traffic-based enforcement.  Tr. 13, 85.  Gunsauls

also supplements SINTF, a local task force that works in conjunction with law enforcement

agencies to enforce California's controlled substance laws.  Tr. 86; *see* Shasta County Sheriff's

Office, *Major Crimes*, http://www.co.shasta.ca.us/index/sheriff_index/divisions/major_

crimes.aspx (last visited July 18, 2016).

       Gunsauls observed a white Nissan Sentra sedan ("the sedan" or "the rental car")

ahead of him in the number one lane (far left lane), which he visually estimated to be traveling at

seventy miles per hour.  Tr. 29–30; *see* Rep. 1.  The posted speed limit was sixty-five miles per

hour.  Tr. 30; *see* Rep. 1.  Cornejo was the driver and sole occupant of the sedan.  Tr. 143, 150;

Rep. 1.  Gunsauls moved directly behind the sedan in the number one lane and activated his radar

unit, which returned a reading of seventy miles per hour.  Tr. 29–30; Rep. 1.  As Gunsauls

approached the sedan, Cornejo slowed to sixty miles per hour, five miles per hour below the

posted speed limit.  Tr. 30; Rep. 1.  Gunsauls testified that he then stopped the sedan because it

"was impacting other traffic on the roadway" and had violated California's speed laws prohibiting

excessive or excessively slow speeds, California Vehicle Code sections 22349[4] and 22400.[5]

Tr. 30–31, 110–11; Ex. 7; Rep. 1.  The only other traffic visible on the video at the time of the

stop, however, is a gray mini-van that was driving in the number two lane (right lane) at some

distance in front of the sedan.  Vid. 9:08:57.  The stop occurred just north of the Fawndale Road

exit on Interstate 5.  Tr. 40, 81; Rep. 1.

       Once Gunsauls activated his overhead lights, the in-car camera and audio system

automatically started recording.  Tr. 24–26; Vid. 9:08:52.  Throughout the stop, as described

below, Gunsauls turned his microphone off and on at various times to selectively mute the audio

---

[4] Section 22349 provides, in pertinent part: ". . . [N]o person may drive a vehicle upon a highway at a speed greater than 65 miles per hour."  Cal. Veh. Code § 22349(a).

[5] Section 22400 provides, in pertinent part:  "No person shall drive upon a highway at such a slow speed as to impede or block the normal and reasonable movement of traffic unless the reduced speed is necessary for safe operation, because of a grade, or in compliance with law . . . ."  Cal. Veh. Code § 22400(a).

1   recording.  Tr. 25–28, 168–69.  Hughes did not have a microphone on his uniform, so Gunsauls

2   controlled the audio recording completely.  Tr. 56.  Gunsauls testified that he turned off his

3   microphone during his conversations with Hughes and other law enforcement personnel for

4   "officer safety reasons."  Tr. 28.  When asked what he meant by this, Gunsauls explained that

5   someone watching the video at a later date could learn his tactics, and that he "[didn't] want to

6   educate the persons that are committing these crimes on how to better do them."  Tr. 180; *see also*

7   Tr. 28, 164–66.

8          In response to Gunsauls' emergency lights, Cornejo pulled over immediately.  Vid.

9   9:08:52–9:09:10; Tr. 80, 143.  Cornejo accidentally turned on the windshield wipers instead of his

10  blinker.  Vid. 9:09:16–9:09:19; Tr. 175.  Gunsauls approached the passenger side door and told

11  Cornejo he stopped him because Cornejo was driving at seventy miles per hour and then "slowed

12  way down" to sixty miles per hour, and there were "cars passing [him] on the wrong side of the

13  road."  Vid. 9:09:28–9:09:39; Rep. 1.  He asked for Cornejo's license and the registration and

14  proof of insurance for the car.  *Id.* 9:09:50–9:10:03.  Cornejo told him that the sedan was a rental

15  and that he was driving to Washington.  *Id.* 9:10:05–09:10:10; Rep. 1.  Cornejo first handed

16  Gunsauls a credit card, realized his mistake, and then gave him a valid Washington state driver's

17  license and a rental agreement from Enterprise Car Rental.  Tr. 32; Rep. 1.

18         The rental agreement was a pre-printed Enterprise form with handwriting on it.

19  Exs. 5, 6a, 6b, 6c; Tr. 41.  Gunsauls testified that the rental agreement appeared suspicious,

20  because he had never seen a handwritten rental agreement before, the agreement included a

21  manual imprint of Cornejo's credit card, and the agreement overall did not appear complete or

22  "legitimate."  Tr. 41, 45–46.  In addition, the agreement had the phrase "CA only" written on it,

23  even though Cornejo said he was traveling to Washington state.  Tr. 43–46.

24         Gunsauls asked about Cornejo's current plans, and Cornejo said he was driving

25  from San Jose, California, where he had been visiting his parents.  Vid. 9:10:10–9:10:35; Rep. 2.

26  The agreement showed Cornejo had rented the car at 11:20 a.m. the day before.  Ex. 5; Tr. 42.

27  Gunsauls looked into the car and saw three empty Rock Star-brand energy drinks, an empty

28  Arizona-brand watermelon drink can, two empty water bottles, one cell phone, and a small bag of

1   chips on the front passenger floor board. Tr. 33, 150–52, 177, 189–91; Ex. 3; Rep. 2. He also

2   saw a second cell phone on the front passenger seat, a GPS unit on the center console, and an

3   Arizona-brand drink in the cup holder of the center console. Tr. 178; Rep. 2. Based on his

4   training and experience, Gunsauls believed the beverage containers indicated long-distance travel

5   over a short period of time. *See* Tr. 33–34, 175–77. He believed San Jose was approximately six

6   hours south of the location of the traffic stop, so he "found it strange or suspicious that somebody

7   would drink that much liquid in six hours, especially energy drinks." Tr. 33. At the evidentiary

8   hearing, Gunsauls acknowledged that he did not know when Cornejo consumed the drinks, and

9   they could have been there from the day before when he rented the car. Tr. 33–34, 154–55.

10          Gunsauls testified that he noticed Cornejo was breathing rapidly and displaying

11   signs of nervousness. Tr. 51–54, 112, 175–77, 188–89; *see* Rep. 2. The video does not provide a

12   clear view of Cornejo during the initial conversation to corroborate Gunsauls' account of

13   Cornejo's behavior. Vid. 9:09:28–9:10:49. Cornejo's breathing is not detectable on the audio

14   due to the amount of background noise. *Id.* Gunsauls told Cornejo to give him a second to check

15   the documents and said he would probably just give Cornejo a warning. Vid. 9:10:43–9:10:49;

16   Rep. 2. This initial conversation lasted approximately one-and-a-half minutes. Vid. 9:09:28–

17   9:10:49.

18          B.      Records Check and Dispatch of Deputy Hughes

19          Gunsauls returned to his patrol car with Cornejo's driver's license and rental

20   agreement while Cornejo waited in the sedan. *Id.* 9:10:49–9:10:55. Gunsauls turned off his

21   microphone. *Id.* 9:11:02; Tr. 27.

22          Gunsauls testified that at this point, he was sixty percent certain Cornejo was

23   smuggling something, based on his nervousness and the empty beverage containers in his vehicle.

24   Tr. 38–40, 184; *see also* Tr. 33–34, 51–54, 175–77. This initial suspicion raised a number of

25   safety concerns. Tr. 38, 48, 184. Gunsauls testified that he knew from his training and

26   experience that persons engaging in smuggling sometimes travel together with an associated

27   vehicle to help defend the substance in their car. Tr. 39–40. As a result, Gunsauls needed to both

28   keep an eye on Cornejo and look out for other cars traveling with him. Tr. 38.

1    While in his patrol car, Gunsauls says he notified dispatch of the traffic stop

2  through his radio, reviewed Cornejo's documents, contacted the El Paso Intelligence Center

3  ("EPIC") to determine if there were any warrants outstanding for Cornejo, and ran the sedan's

4  license plate.  Tr. 46–47, 145, 149, 182–83.  Gunsauls ran the license plate on the computer inside

5  his patrol car at or about 9:15 a.m. and learned within a minute that the sedan was not reported

6  lost or stolen.  Tr. 229; Ex. 15. at 4–5.  The timing of the EPIC check is not clear from the record,

7  but Gunsauls testified that it typically takes between three and five minutes to complete.

8  *Compare* Tr. 183–84 (Gunsauls did not remember the timing, but on average an EPIC check takes

9  three to five minutes), *with* Tr. 117 (Gunsauls was on the phone with EPIC for ten minutes, until

10  Hughes arrived).  Gunsauls learned Cornejo had no outstanding warrants.  Tr. 47, 147, 149.

11  Although Gunsauls had the capability, he did not at this time run Cornejo's driver's license to

12  verify its validity.  Tr. 148–49.  Neither did he call Enterprise Car Rental to verify the legitimacy

13  of the agreement.  Tr. 121–22, 149.  Gunsauls also did not begin filling out the warning citation.

14  *See* Vid. 9:10:58–9:21:11 (reflection in window shows Gunsauls setting his clipboard down on

15  the far right-hand side of his dashboard, where it remains untouched for approximately ten

16  minutes); *id.* 9:21:38–9:21:48 (after exiting his patrol car, Gunsauls pulls out a blank warning

17  citation, places it on top of his clipboard, checks his watch, and then begins filling out the

18  citation).  Gunsauls later wrote in his Investigative Report that he observed Cornejo fidgeting

19  while he waited in the sedan, Tr. 2, but Cornejo's actions as seen on the dashboard video do not

20  convey any obvious nervousness, *see* Vid. 9:10:58–9:21:11.

21    When Gunsauls broadcast over dispatch that he was conducting a traffic stop,

22  Deputy Ray Hughes overheard the transmission and responded that he was on his way to the

23  scene.  Tr. 183–86, 199, 230; Ex. 15 at 1.  Gunsauls normally works with a second deputy when

24  conducting a highway traffic stop.  Tr. 199–201.  Gunsauls waited for Hughes to arrive.  Tr. 184.

25    C.    Instruction to Exit Vehicle and Pat-Down Search

26    Approximately eight minutes after Gunsauls initiated the stop, Hughes arrived.

27  Tr. 146; Ex. 15 at 1.  Gunsauls and Hughes spoke briefly off camera and without the audio on, for

28  about four minutes.  Tr. 49, 119, 146, 160.  Gunsauls was halfway seated in the front passenger

seat of the patrol car and Hughes was standing outside of the car by the open, passenger side

door.  Tr. 119, 146.  Approximately twelve minutes into the stop, Hughes approached the

passenger side of the sedan and instructed Cornejo to exit.  Vid. 9:21:12–9:21:25; Tr. 49; Rep. 2.

Gunsauls left his patrol car and turned his microphone back on.  Vid. 9:21:18–9:21:29; Tr. 119.

At Hughes' request, Cornejo consented to a pat down search, and while Hughes searched him,

Gunsauls began filling out the written warning citation on his clipboard in front of his patrol car.

Vid. 9:21:38–9:22:00; Tr. 49–50, 120; Rep. 2.  Hughes found no weapons.  Vid. 9:21:38–9:22:00;

Tr. 49; Rep. 2.  Hughes then told Cornejo to stand next to Gunsauls in front of the patrol car.

Vid. 9:21:56.

> ### D.    Completion of Written Citation and Questioning

Gunsauls spoke with Cornejo while he continued to fill out the written warning

citation.  *Id.* 9:22:04.  During this time, Hughes stood guard to the side, in the background of the

video or off camera.  *Id.* 9:22:04–9:22:23.  Gunsauls testified that Hughes was there to watch out

for other vehicles and keep an eye on Cornejo.  Tr. 56–57, 196.  Later, however, Gunsauls had

Hughes complete the warning citation while Gunsauls simultaneously conducted a K-9 sniff of

the sedan.  Vid. 9:28:23–9:30:40.  Nothing in the record suggests any of the safety concerns that

required Hughes to provide backup at one point lessened later in the stop.

The warning citation is a one-page document that contains fifteen lines.  Ex. 7.

Gunsauls testified that practical issues, such as needing to confirm the recipient's eye color, and

safety concerns, such as staying aware of surroundings, add time to filling out the citation.

Tr. 171–74.  During his conversation with Cornejo, Gunsauls wrote in the time and date;

Cornejo's name, mailing address, driver's license number, age, and physical description; the

vehicle's license plate and description; the owner and insurer of the vehicle; and the vehicle code

violation.  Ex. 7; *see* Tr. 132 (describing which sections Gunsauls filled in, and which Hughes

later filled in as described below).  Cornejo is a 5'10", Hispanic male and was 200 pounds and

twenty-seven years old at the time.  Ex. 7; *see* Vid. 9:26:40 (confirming information with

Cornejo).  Cornejo told Gunsauls he was driving at sixty-six miles per hour on cruise control, and

1   then decreased the cruise control to sixty-five miles per hour when he saw Gunsauls' patrol

2   vehicle.  Vid. 9:22:08–9:22:39.

3         Gunsauls told Cornejo that his radar read sixty-miles per hour when he stopped

4   Cornejo and that a mini-van had passed them on the right-hand side.  Vid. 9:22:30–9:22:49;

5   Rep. 2.  As noted, the video shows the gray mini-van driving in the number two lane and at some

6   distance in front of Cornejo when he was pulled over.  Vid. 9:08:52.  No other cars are visible in

7   the video at the time of the stop.

8         Gunsauls told Cornejo the citation was just a warning and was not a real ticket.

9   Vid. 9:23:08–9:23:13; Rep. 2.  Cornejo asked if he would have to go to court, and Gunsauls told

10   him he would not need to, because it was just a warning.  Vid. 9:23:25–9:23:32; Rep. 2.

11         While he continued completing the warning citation, Gunsauls asked Cornejo

12   more questions, such as how long he was in San Jose; where Toppenish, the city on Cornejo's

13   driver's license, is located; personal demographic information requested by the warning citation;

14   what he did for a living; and where he was going to return the car.  Vid. 9:23:05–9:28:23; Rep. 3.

15   Cornejo responded that he was visiting his parents in San Jose for a few days, details cars for a

16   living, and was going to return the rental car in Washington.  Vid. 9:23:05–9:28:23.  Cornejo

17   delayed slightly before responding where Toppenish is located.  Vid. 9:23:44–9:24:06.  Gunsauls

18   asked whether he was supposed to return the car in Washington or California, and he said

19   Washington.  Vid. 9:24:26–9:24:34.  Gunsauls said the rental car agreement indicated "CA only."

20   Vid. 9:24:36–9:24:40.  Cornejo said, "Well I'm supposed to, but then I checked my (inaudible).  I

21   gotta return it over here 'cuz I don't want to come back and, uh, you know."  Vid. 9:24:42–

22   9:24:49.  Gunsauls asked if Enterprise knew he was going to return it in Washington, and Cornejo

23   said yes.  Vid. 9:24:50–9:24:54.  Gunsauls said he had never seen that before.  Vid. 9:24:58–

24   9:25:04.  Cornejo said it is a little more expensive, but his own car was not a good car, and he did

25   not want it breaking down in the middle of the road.  Vid. 9:25:04–9:25:12; *see also* Rep. 3.  In

26   the Investigative Report, Gunsauls wrote at this point he "believed [Cornejo] was lying to [him]

27   and his story was not making sense."  Rep. 3.

28

1    Gunsauls testified that Cornejo's nervousness appeared to increase as the stop

2   progressed, even after he was told he would receive only a warning.  Tr. 52–53; Rep. 3.  During

3   their conversation, Cornejo shifted his weight between his feet and occasionally shrugged his

4   shoulders and bit or pursed his lips.  *See, e.g.*, Vid. 9:23:34, 9:24:23–9:24:26, 9:26:35; *see* Tr. 53–

5   54; Rep. 3.  Nothing in Cornejo's demeanor or tone of voice conveys anger, belligerence, or lack

6   of respect.  Cornejo again questioned the basis for the stop, and Gunsauls told him he had been

7   speeding and then slowed below the speed limit.  Vid. 9:25:20–9:26:31.  Gunsauls then asked

8   whether there were guns or drugs or large amounts of money in the sedan, and Cornejo responded

9   that there were not.  Vid. 9:27:17–9:27:34; Rep. 3.  Gunsauls requested permission to search the

10  sedan.  Vid. 9:27:34–9:27:54; Rep. 3.  Cornejo initially gave his consent, but then withdrew it

11  after Gunsauls explained that he could say, "No."  Vid. 9:27:34–9:27:54; Rep. 3.  Gunsauls asked

12  if everything was okay with his license, and he said yeah.  Vid. 9:28:12–9:24:14.  Gunsauls did

13  not at this time run Cornejo's driver's license to verify its validity.  Tr. 180; Ex. 15 at 1–2.

14  Gunsauls asked if Cornejo had ever gotten a ticket before, and he said he had once, for rolling a

15  stop sign.  Vid. 9:28:14–9:28:22.

16    E.    K-9 Sniff of Rental Car

17    After speaking with Cornejo for approximately six-and-a-half minutes in total,

18  Gunsauls instructed Hughes to finish the warning citation.  Vid. 9:28:23–9:28:33; Tr. 56; Rep. 3.

19  At this point, approximately twenty minutes had passed since Cornejo was first pulled over.

20  Gunsauls again turned off his microphone and retrieved his narcotics K-9 from the patrol car to

21  perform a sniff of the sedan.  Vid. 9:28:35–9:29:16; Tr. 56.  Hughes wrote the words, "Insur.,"

22  "(Radar 70 MPH)," "N/B I-5 N of Fawndale," and "J Gunsauls 8N53" on the warning citation.

23  Ex. 7; Tr. 132.  Hughes completed these entries in less than one minute, Vid. 9:28:30–9:29:16,

24  but then held on to the citation and Cornejo's documents and waited another minute-and-a-half

25  for Gunsauls to complete the K-9 sniff, Vid. 9:29:16–9:30:40.  Gunsauls testified that the K-9

26  alerted to the front of the sedan.  Tr. 56–57; Rep. 3.  The video shows the K-9 first responded

27  with some enthusiasm at the open, passenger side window, Vid. 9:29:24, then sniffed more

28  intently the right front area of the bumper, Vid. 9:29:28.  *See also* Tr. 57.  When Gunsauls walked

10

1  around the vehicle a second time, the view from the video is mostly blocked, but Gunsauls

2  testified that the K-9 again sniffed the front area of the vehicle more intently, and when Gunsauls

3  walked him away from that area, he dragged Gunsauls back towards the front of the car.  Tr. 57;

4  Vid. 9:30:00–9:30:30.  Gunsauls returned the K-9 to his patrol car.  Vid. 9:30:30; Rep. 3.

5         Gunsauls turned his microphone back on and asked Cornejo again whether there

6  was anything illegal in the sedan.  Vid. 9:30:41.  Cornejo again said no.  Vid. 9:30:46.  Gunsauls

7  asked how long he had had the rental, and Cornejo responded he rented it the day before.

8  Vid. 9:30:47–9:30:52.  Gunsauls asked if any of his friends used marijuana, and he said no.  Vid.

9  9:30:52–9:30:55.  Gunsauls told Cornejo the K-9 had alerted to the front of the car, and he was

10  going to take a look.  Vid. 9:30:56–9:31:07.

11         F.      Search of Rental Car and Interview of Cornejo

12         Gunsauls again turned off his microphone and began searching the sedan.  Vid.

13  9:31:31.  He found a store receipt from Bakersfield with a time stamp of 1:01 a.m., which was

14  inconsistent with what Cornejo had told him because Bakersfield is located a few hours south of

15  San Jose.[6]  Vid. 9:32:06; *see id.* 9:32:30; Tr. 62; Rep. 4.  Gunsauls turned on his microphone and

16  asked Cornejo about the receipt.  Vid. 9:32:19, 9:32:30.  Cornejo continued to deny that there was

17  anything illegal in the car and said, "You can check."  Vid. 9:32:44.

18         Gunsauls and Hughes placed Cornejo in the back of Hughes' patrol car,

19  Vid. 9:32:46; Tr. 65, and continued searching the sedan, Vid. 9:34:41.  At approximately

20  9:35 a.m., one of the deputies checked the validity of Cornejo's driver's license with dispatch,

21  and it came back clear.  Ex. 15 at 1–2 ("CDL: STATUS: NONE"; "STATUS: CLEAR"); Tr. 68,

22  127, 163–64, 167, 180, 197, 231–35.  During the search, Gunsauls and Hughes discovered drug

23  packages in the rear driver's side passenger door.  Tr. 58, 65–66.  At 9:52 a.m., due to safety

24  concerns, they dispatched a third officer to the site to drive the sedan to a storage facility to

25  continue the search.  Ex. 15 at 1, 4 ("12/13/14 09:52 SH0244 CO ONE DETAINED, REQ 1

26

27  _____

        [6] The court takes judicial notice of the distance between Bakersfield and San Jose,
28  approximately 241 miles if driving on I-5, under Federal Rule of Evidence 201.

11

1    ADDTL UNIT FOR VEH TRANSPORT TO SHOP ON . . . WONDERLAND"); Tr. 65–67; Vid.

2    10:14:07–10:14:53; Rep. 4.

3           Gunsauls later advised Cornejo of his rights and interviewed him.  Rep. 5–6.

4    Cornejo told Gunsauls he drove from Sunnyvale to Los Angeles to pick up the drugs and was

5    transporting them to Salem, Oregon to repay a debt.  *Id.*  He told Gunsauls he did not know

6    exactly what he was transporting or where it was hidden, but he knew there were drugs in the car.

7    *Id.* at 5.

8           At 1:53 p.m., the sedan was towed from the storage facility by Enterprise Towing.

9    Rep. 6; Ex. 15 at 2, 4 ("12/13/14 13:53 SH0251 CO TOW 97 AND TOOK POSSESSION OF

10   VEH").

11        G.     Evidence Seized and Subject of Motion

12          Cornejo seeks to suppress the following evidence, which was obtained through the

13   search:

14          (1) three bundles of suspected methamphetamine, weighing 3,028.6 grams

15              (booked as D100);

16          (2) three bundles of suspected heroine, weighing 2,218 grams (booked as D101);

17          (3) $5,000 bulk U.S. currency (booked as C100);

18          (4) two LG cell phones (booked as M100);

19          (5) the Enterprise rental agreement and receipts (booked as M101);

20          (6) the GPS unit from the sedan; and

21          (7) any other evidence recovered from the sedan.

22   *See* ECF No. 28 at 2.  Cornejo also seeks to suppress all statements he made, without clarifying a

23   specific time frame for the statements.  *Id.*

24   III.    LEGAL STANDARDS FOR MOTIONS TO SUPPRESS EVIDENCE

25          "The exclusionary rule was adopted to effectuate the Fourth Amendment right of

26   all citizens 'to be secure in their persons, houses, papers, and effects, against unreasonable

27   searches and seizures . . . .'"  *United States v. Calandra*, 414 U.S. 338, 347 (1974) (quoting U.S.

28   Const. amend IV).  The Fourth Amendment applies to the states by virtue of the Fourteenth

1    Amendment.  *Mapp v. Ohio*, 367 U.S. 643, 650, 655–56 (1961).  Under the exclusionary rule, a

2    criminal defendant may move to suppress evidence that was obtained in violation of his or her

3    Fourth Amendment rights.  *Id.*; *see* Fed. R. Crim. P. 41(h); *Weeks v. United States*, 232 U.S. 383

4    (1914).  This prohibition applies both "to direct products of an illegal search—i.e., the physical

5    evidence found during the search itself—and to indirect products of the illegal search—i.e.,

6    statements or physical evidence subsequently obtained in part as a result of the search—if they

7    bear a sufficiently close relationship to the underlying illegality."  *United States v. Shetler*, 665

8    F.3d 1150, 1157 (9th Cir. 2011) (citation and internal quotation marks omitted); *see also Wong*

9    *Sun v. United States*, 371 U.S. 471, 484 (1963).

10           The Supreme Court has explained that the exclusionary rule "is a judicially created

11   remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect,

12   rather than a personal constitutional right of the party aggrieved."  *Calandra*, 414 U.S. at 348; *see*

13   *Davis v. United States*, 564 U.S. 229, 236–37 (2011).  As a result, not every Fourth Amendment

14   violation calls for the remedy of suppression of the evidence.  *See Davis*, 564 U.S. at 232, 242–

15   44.  When deciding a motion to suppress, courts first determine whether a Fourth Amendment

16   violation occurred, and then consider whether the suppression of evidence is the appropriate

17   sanction.  *Id.*

18           With respect to the first inquiry, "searches and seizures conducted outside the

19   judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the

20   Fourth Amendment—subject only to a few specifically established and well delineated

21   exceptions."  *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (citations and internal quotation

22   marks omitted).  When a defendant moves to suppress evidence, the government bears the burden

23   of proving by a preponderance of the evidence that a warrantless search or seizure falls within

24   one of the delineated exceptions to the warrant requirement.  *See United States v. Huguez-Ibarra*,

25   954 F.2d 546, 551 (9th Cir. 1992); *see also United States v. Matlock*, 415 U.S. 164, 177 n.14

26   (1974) (citing *Lego v. Twomey*, 404 U.S. 477, 488–89 (1972)).

27           One such exception is a so-called *Terry* stop.  In *Terry v. Ohio*, 392 U.S. 1 (1968),

28   the Supreme Court held that police may briefly detain a person they reasonably suspect is

1  connected with criminal activity to investigate the circumstances that provoke suspicion.  *Id.*

2  at 27–29.  Reasonable suspicion "exists when an officer is aware of specific, articulable facts

3  which, when considered with objective and reasonable inferences, form a basis for *particularized*

4  suspicion."  *United States v. Montero–Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc)

5  (emphasis in original); *see also United States v. Michael R.*, 90 F.3d 340, 346 (9th Cir. 1996).

6  This standard also applies to seizures for traffic violations, because "[a] routine traffic stop . . . is

7  a relatively brief encounter and 'is more analogous to a . . . *Terry* stop . . . than to a formal

8  arrest.'"  *Knowles v. Iowa*, 525 U.S. 113, 117 (1998) (quoting *Berkemer v. McCarty*, 468 U.S.

9  420, 439 (1984)); *accord Rodriguez v. United States*, ___ U.S. ___, 135 S. Ct. 1609, 1614–15

10  (2015).  As with *Terry* stops, "[t]he stop and inquiry must be 'reasonably related in scope to the

11  justification for their initiation.'"  *Berkemer*, 468 U.S. at 439 (quoting *United States v. Brignoni–*

12  *Ponce*, 422 U.S. 873, 881 (1975)).

13  Here, Cornejo argues the warrantless traffic stop and search of his rental car were

14  unlawful under the Supreme Court's recent decision in *Rodriguez*, 135 S. Ct. 1609, which was

15  issued after the search and seizure he challenges occurred.  As explained in detail below,

16  *Rodriguez* held that a K-9 sniff of a vehicle conducted during a traffic stop must be supported by

17  an independent, reasonable suspicion of criminal activity if it adds any time to the stop.  *Id.*

18  at 1614–16.  Cornejo may invoke *Rodriguez* as a basis for his motion, because Supreme Court

19  decisions construing the Fourth Amendment apply retroactively to all cases that were not yet final

20  at the time of the decision.  *United States v. Johnson*, 457 U.S. 537, 562 (1982), *abrogation on*

21  *other grounds recognized by Roman v. Abrams*, 822 F.2d 214, 227 (2d Cir. 1987); *see also*

22  *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987).

23  Even if the court finds a Fourth Amendment violation occurred at the first step, the

24  government may obtain admission of the challenged evidence by establishing that an exception to

25  the exclusionary rule applies at the second step of the analysis.  *Davis*, 564 U.S. at 243–44.  Here,

26  the government argues the good-faith exception[7] applies, which provides that "searches

27

28
---
[7] This rule has also been referred to as the "faith-in-caselaw" exception to the exclusionary rule.  *United States v. Thomas*, 726 F.3d 1086, 1093 (9th Cir. 2013) (quoting Caleb

1   conducted in objectively reasonable reliance on binding appellate precedent are not subject to the

2   exclusionary rule," *Davis*, 564 U.S. at 232; *see also Thomas*, 726 F.3d at 1093 (applying *Davis*'

3   good-faith exception).  The government contends that in extending the stop Gunsauls and Hughes

4   reasonably relied on binding, pre-*Rodriguez* precedent, specifically, *Illinois v. Caballes*, 543 U.S.

5   405, 407 (2005).  ECF No. 77 at 10.

6                The Court in *Davis* instructed that, in deciding whether to apply the exclusionary

7   rule or the good-faith exception to that rule, courts must balance the deterrent effect of excluding

8   the evidence against "the substantial social costs generated by the rule."  564 U.S. at 237

9   (quotation marks and citation omitted); *accord Utah v. Strieff*, ___ U.S. ___, 136 S. Ct. 2056,

10  2059 (2016) ("[E]ven when there is a Fourth Amendment violation, [the] exclusionary rule does

11  not apply when the costs of exclusion outweigh its deterrent benefits.").  The Court explained that

12  exclusion "exacts a heavy toll on both the judicial system and society at large," because "[i]t

13  almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or

14  innocence," and "its bottom-line effect, in many cases, is to suppress the truth and set the criminal

15  loose in the community without punishment."  *Davis*, 564 U.S. at 237 (citations omitted).  As a

16  result, "[p]olice practices trigger the harsh sanction of exclusion only when they are deliberate

17  enough to yield 'meaningfu[l]' deterrence, and culpable enough to be 'worth the price paid by the

18  justice system.'"  *Id.* at 240 (quoting *Herring v. United States*, 555 U.S. 135, 144 (2009)).

19  Following *Davis*, the Ninth Circuit has interpreted the good-faith exception as limited to police

20  conduct "specifically *authorize*[*d*]" by binding precedent.  *Thomas*, 726 F.3d at 1095 (quoting

21  *Davis*, 564 U.S. at 241) (emphasis added in *Thomas*); *see also United States v. Lara*, 815 F.3d

22  605, 613 (9th Cir. 2016) (distinguishing the exception from the doctrine of qualified immunity

23  and "declin[ing] to expand the rule in *Davis* to cases in which the appellate precedent, rather than

24  being binding, is (at best) unclear").

25

26

27

28   Mason, *New Police Surveillance Technologies and the Good–Faith Exception: Warrantless GPS Tracker Evidence After United States v. Jones*, 13 Nev. L.J. 60, 66 (2012)).

1   IV.   DISCUSSION

2          Cornejo does not dispute that Gunsauls' initial decision to pull him over was

3   lawful.  ECF No. 33 at 2 n.1.  As discussed above, to lawfully detain a suspect for an

4   investigatory traffic stop, an officer must have a reasonable suspicion that a traffic violation

5   occurred.  *United States v. Lopez-Soto*, 205 F.3d 1101, 1104–05 (9th Cir. 2000); *Montero–*

6   *Camargo*, 208 F.3d at 1129.  Here, Gunsauls detected with a radar reading that Cornejo was

7   traveling at a speed first above and then under the speed limit.  Tr. 30–31, 110–11; Ex. 7; Rep. 1.

8   This gave Gunsauls a "particularized and objective basis" for suspecting Cornejo had violated

9   California Vehicle Code sections 22349 and 22400.  *See United States v. Arvizu*, 534 U.S. 266,

10  273 (2002).

11         In addition, Cornejo does not dispute, and the court independently finds, that once

12  the K-9 alerted to the front of Cornejo's car, Gunsauls had probable cause to search the car.  The

13  Supreme Court has held that a K-9 alert can give an officer probable cause to search a vehicle

14  when the drug-detection dog is well-trained and reliable, and other circumstances surrounding a

15  particular alert do not undermine the case for probable cause.  *Florida v. Harris*, ___ U.S. ___,

16  133 S. Ct. 1050, 1055–59 (2013).  Gunsauls' testimony establishes that his K-9 partner, Chase,

17  alerted to the front of Cornejo's vehicle, and that Chase was a well-trained and reliable drug-

18  detection dog.  Tr. 12, 17–23, 57–59; Vid. 9:30:09.

19         Two issues, then, are presented by Cornejo's motion: (1) whether the traffic stop

20  was unlawfully prolonged under *Rodriguez*, 135 S. Ct. at 1614–15; and (2) if so, whether the

21  good-faith exception to the exclusionary rule applies to justify prolonging the stop.  The court

22  addresses each in turn.

23         A.    Lawfulness of Traffic Stop

24               1.    *Rodriguez*

25         The court begins with an overview of the Supreme Court's decision in *Rodriguez*,

26  *supra*.  In *Rodriguez*, after issuing a warning ticket, the officer asked the defendant for consent to

27  a K-9 sniff search of his car, which the defendant refused.  135 S. Ct. at 1613.  The officer

28  detained the defendant until a second officer arrived, then conducted a K-9 sniff of the vehicle,

16

1   and the dog alerted.  *Id.*  The government argued that the seizure was justified because the seven-

2   or eight-minute delay constituted only a "*de minimis*" additional intrusion on the defendant's

3   rights.  *Id.* at 1615–16.  The Court rejected that argument.  *Id.*  It explained, "Like a *Terry* stop,

4   the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's

5   'mission'—to address the traffic violation that warranted the stop and attend to related safety

6   concerns."  *Id.* at 1614 (internal citations omitted); *see also id.* at 1616 (explaining "an officer

7   may need to take certain negligibly burdensome precautions," such as checking for outstanding

8   warrants, "in order to complete his mission safely").  Because the purpose of a traffic stop is to

9   address the traffic violation, authority for the seizure ends "when tasks tied to the traffic

10  infraction are—or reasonably should have been—completed."  *Id.* at 1614; *Caballes*, 543 U.S.

11  at 407.  The Court held that an officer may not conduct unrelated checks in a way that prolongs

12  the stop "absent the reasonable suspicion ordinarily demanded to justify detaining an individual."

13  *Rodriguez*, 135 S. Ct. at 1615.

14          An officer's "mission" during a traffic stop typically includes routine tasks related

15  to the enforcement of the traffic code, such as checking the driver's license, determining whether

16  there are outstanding warrants against the driver, and inspecting the car registration and proof of

17  insurance.  *Rodriguez*, 135 S. Ct. at 1615; *see also United States v. Evans*, 786 F.3d 779, 786 (9th

18  Cir. 2015); *United States v. Munoz*, 590 F.3d 916, 920–21 (8th Cir. 2010) ("[A]fter making a

19  traffic stop, an officer may detain the driver while he completes a number of routine but

20  somewhat time-consuming tasks related to the traffic violation, such as computerized checks of

21  the vehicle's registration and the driver's license and criminal history, and the writing up of a

22  citation or warning." (citation and quotation marks omitted)).  "A dog sniff, by contrast is a

23  measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing,'" and therefore is not

24  fairly characterized as part of the officer's traffic mission.  *Rodriguez*, 135 S. Ct. at 1615 (quoting

25  *Indianapolis v. Edmond*, 531 U.S. 32, 40–41 (2000)).  As a result, an officer may not prolong a

26  traffic stop to conduct a dog sniff absent independent, reasonable suspicion of criminal activity.

27  *Id.* at 1615–17; *accord Evans*, 786 F.3d at 786–88 (ex-felon registration check and dog sniff are

28

1 │ "wholly unrelated" to the officer's traffic mission and therefore require independent, reasonable

2 │ suspicion).

3 │        2.        Analysis

4 │        Applying *Rodriguez*, the court examines whether the traffic stop was extended

5 │ longer than was reasonably necessary to complete the traffic mission, and if so, whether the

6 │ deputies had an independent, reasonable suspicion justifying the delay leading up to the dog sniff.

7 │                a)        Whether the Duration of the Stop Was Extended

8 │        Cornejo conceded at hearing, and the court independently finds, that the first

9 │ twelve minutes of the stop would have constituted a lawful seizure had Gunsauls then permitted

10 │ Cornejo to leave.  *See* ECF No. 76 at 12.  During this time, Gunsauls retrieved Cornejo's

11 │ documents, checked for warrants and reports of lost or stolen vehicles, and waited for Hughes to

12 │ arrive.  Vid. 9:08:52–9:21:11; Tr. 46–47, 145, 149, 182–83.  These tasks are connected to the

13 │ traffic mission and related safety concerns and took a reasonable amount of time.  *See Rodriguez*,

14 │ 135 S. Ct. at 1614–16 (providing examples of criminal record and outstanding warrant checks as

15 │ safety precautions taken to facilitate traffic mission); *cf. Pennsylvania v. Mimms*, 434 U.S. 106,

16 │ 109–10 (1977) (per curiam) (emphasizing "weighty" interest in officer safety during traffic stop);

17 │ *United States v. Williams*, 419 F.3d 1029 (9th Cir. 2005).  However, Cornejo argues the stop was

18 │ unlawfully extended when Gunsauls filled in the written warning citation and asked him

19 │ questions in front of the patrol car, and when Hughes finished completing the written warning

20 │ while Gunsauls conducted a K-9 sniff of the sedan.  *See* ECF No. 76 at 10–12.

21 │        Prior to *Rodriguez*, in *United States v. Mendez*, 476 F.3d 1077 (2007), the Ninth

22 │ Circuit held that an officer does not need independent, reasonable suspicion to support

23 │ questioning unrelated to the traffic mission if the questioning does not prolong the stop.  *Id.*

24 │ at 1080–81 (questioning occurred while officer ran check on defendant's identification).

25 │ Similarly, in *Arizona v. Johnson*, 555 U.S. 323 (2009), the court held that "[a]n officer's inquiries

26 │ into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into

27 │ something other than a lawful seizure, so long as those inquiries do not measurably extend the

28 │ duration of the stop."  *Id.* at 333.  In *United States v. Turvin*, 517 F.3d 1097 (2008), the Ninth

1   Circuit expanded the scope of permissible questioning and held that it may be lawful for an

2   officer to briefly pause a stop to ask a few unrelated questions if the overall detention is

3   reasonable.  *Id.* at 1098, 1101–04 (officer paused ticket-writing process to ask defendant about

4   drugs and for consent to search his vehicle; total duration of stop until defendant consented to

5   search was about fourteen minutes).  The court refused to adopt a bright-line rule.  *Id.* at 1103.

6           There is some tension between *Turvin*, which permits slight prolongations to ask

7   unrelated questions, and *Rodriguez*, which requires independent, reasonable suspicion if a dog

8   sniff adds any time to a traffic stop.  *Rodriguez* did not distinguish between prolongations caused

9   by dog sniffs and those caused by unrelated questioning.  Rather, it grouped the two types of

10  investigation together in its analysis:

11          In both [*Illinois v. Caballes* and *Arizona v. Johnson*], we concluded
            that the Fourth Amendment tolerated certain unrelated
12          investigations that did not lengthen the roadside detention.
            *Johnson*, 555 U.S. at 327–328 (questioning); *Caballes*, 543 U.S., at
13          406, 408 (dog sniff).  In *Caballes*, however, we cautioned that a
            traffic stop "can become unlawful if it is prolonged beyond the time
14          reasonably required to complete th[e] mission" of issuing a warning
            ticket.  543 U.S. at 407.  And we repeated that admonition in
15          *Johnson*: The seizure remains lawful only "so long as [unrelated]
            inquiries do not measurably extend the duration of the stop." 555
16          U.S. at 333; *see also Muehler v. Mena*, 544 U.S. 93, 101 (2005)
            (because unrelated inquiries did not "exten[d] the time [petitioner]
17          was detained[,] . . . no additional Fourth Amendment
            justification . . . was required").
18

19  135 S. Ct. at 1614–15.  Although this seems to suggest unrelated questioning, like a dog sniff,

20  must be supported by an independent, reasonable suspicion whenever it adds any time to a stop,

21  the court need not resolve any apparent conflict between *Rodriguez* and *Turvin* here, because

22  Gunsauls' questioning of Cornejo unreasonably extended the stop under either approach.

23          As stated above, Gunsauls did not begin filling out the written warning citation

24  during the ten minutes that he waited in his patrol car for the record checks and for Hughes to

25  arrive.  *See* Vid. 9:10:58–9:21:11.  By the time he began completing the citation and asking

26  Cornejo questions, Gunsauls already knew Cornejo did not have any outstanding warrants, the

27  sedan was not reported lost or stolen, and Cornejo did not have any weapons on him.  He had

28  reviewed, but had chosen not to verify, Cornejo's driver's license and rental car agreement, and

1    had learned where Cornejo said he was traveling and the purpose of his travels.  After having

2    completed these tasks, twelve minutes after the initial stop, Gunsauls spent another approximately

3    six-and-a-half minutes asking Cornejo questions and filling out the one-page, written warning

4    citation while Hughes stood by.  Vid. 9:21:38–9:29:16.  A number of Gunsauls' questions at this

5    point were not reasonably related to the traffic mission, such as what Cornejo did for a living,

6    how long he was in San Jose, where Toppenish is located, what kind of car he owns, whether the

7    rental car contained any weapons or drugs, and whether he consented to a search of the rental car.

8    Approximately twenty minutes into the stop, Gunsauls directed Hughes to "complete" the

9    warning citation while he performed the K-9 sniff.  The only remaining blank entries on the form

10   were the location of the violation and the citing officer's name and identification number, which

11   Hughes quickly completed, in less than one minute, Vid. 9:28:30–9:29:16.  *See* Ex. 7; Tr. 132.

12         The court finds the approximately eight minutes was an unreasonably long

13   duration for Gunsauls and Hughes to complete the simple, one-page, written warning citation.

14   Gunsauls testified that safety concerns, such as the need to stay aware of the surroundings,

15   typically add time to filling out a citation, Tr. 171–74, but in this case, Hughes stood by and

16   provided back up while Gunsauls filled out most of the warning citation.  Considering the totality

17   of the record, it appears Gunsauls consciously drew out filling out the entries in the citation in

18   order to fish for information.  He then further delayed the task by handing the citation off to

19   Hughes when there were only two entries remaining, one of which was Gunsauls' own name and

20   identification number.  The video establishes that the dog sniff added time to the stop, because it

21   shows that after Hughes completed the citation, he retained the citation and Cornejo's documents

22   for another minute-and-a-half while he waited for Gunsauls to finish walking his dog around the

23   car.  Vid. 9:29:16–9:30:40.  *Rodriguez* does not authorize questioning a person or performing a

24   K-9 sniff while purporting to fill out a ticket or citation; it held a traffic stop "become[s] unlawful

25   if it is prolonged beyond the time reasonably required to complete th[e] mission of issuing a ticket

26   for the violation."  135 S. Ct. at 1612 (citation and quotation marks omitted).  Here, the mission

27   of issuing a warning citation reasonably required substantially less than eight minutes under the

28   circumstances.  The fact that the deputies waited more than twenty-five minutes after the stop was

20

1    initiated to check the validity of Cornejo's license in no way justifies the unrelated tasks taken in

2    between. *See* Ex. 15 at 1–2; Tr. 68, 127, 163–64, 167, 180, 197, 231–35.

3            In *Rodriguez*, the Supreme Court explained, "The critical question . . . is not

4    whether the dog sniff occurs before or after the officer issues a ticket, . . . but whether conducting

5    the sniff 'prolongs'—*i.e.,* adds time to—'the stop.'" 135 S. Ct. at 1616 (quoting 135 S. Ct. at

6    1615) (italics in original). The Court also rejected the argument that an officer may

7    "incremental[ly]" prolong a stop to conduct unrelated tasks so long as "the overall duration of the

8    stop remains reasonable in relation to the duration of other traffic stops involving similar

9    circumstances." *Id.* Here, the evidence shows Gunsauls' questioning on unrelated topics and

10   calibrated delay in filling out the warning citation, as well as the subsequent K-9 sniff of the

11   rental car, added time to the traffic stop.

12           b)      Whether the Deputies Had an Independent, Reasonable Suspicion

13           Because the duration of the stop was unnecessarily extended, the seizure was

14   unlawful unless the deputies had an independent, reasonable suspicion of criminal activity.

15   *Rodriguez*, 135 S. Ct. at 1615–17.

16           As stated above, reasonable suspicion requires that an officer have a

17   "particularized and objective basis" for suspecting the person has committed or is about to

18   commit a crime. *Arvizu*, 534 U.S. at 273; *Montero-Camargo*, 208 F.3d at 1129. The Ninth

19   Circuit has clarified the contours of this requirement in rejecting "profiles that are 'likely to

20   sweep many ordinary citizens into a generality of suspicious appearance,'" such as ethnic

21   appearance or the act of glancing in the rear view mirror at an approaching law enforcement

22   vehicle. *Montero-Camargo*, 208 F.3d at 1129–30, 1132, 1136 (quoting *United States v.*

23   *Rodriguez*, 976 F.2d 592, 595–96 (9th Cir. 1992)). These types of factors describe too many

24   individuals to create a particularized suspicion. *Id.*

25           When reviewing an officer's reasonable suspicion, the court considers the totality

26   of the circumstances. *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (en

27   banc). "This process allows officers to draw on their own experience and specialized training to

28   make inferences from and deductions about the cumulative information available to them that

21

1     might well elude an untrained person." *Arvizu*, 534 U.S. at 273 (citations and internal quotation

2     marks omitted).  "It also precludes a 'divide-and-conquer analysis' because even though each of

3     the suspect's 'acts was perhaps innocent in itself . . . taken together, they [may] warrant[ ] further

4     investigation.'"  *Valdes-Vega*, 738 F.3d at 1078 (quoting *Arvizu*, 534 U.S. at 274) (alterations in

5     *Valdes-Vega*).  "In assessing whether a detention is too long in duration to be justified as an

6     investigative stop," it is proper "to examine whether the police diligently pursued a means of

7     investigation that was likely to confirm or dispel their suspicions quickly."  *United States v.*

8     *Sharpe*, 470 U.S. 675, 686 (1985).

9                 The government identifies the following initial "warning signs" of criminal

10    activity: (1) Cornejo was traveling on the northbound side of I-5, which is a route commonly used

11    to transport drugs from Southern California to Oregon and Washington; (2) when Gunsauls

12    initially approached Cornejo, he was breathing more rapidly and appeared more nervous than the

13    average driver; and (3) Gunsauls noticed three Rock Star energy drinks, two Arizona iced tea

14    drinks, and empty water bottles in the front passenger floor area and center cup holder, and

15    "found it strange or suspicious that somebody would drink that much liquid in [the] six hours [it

16    takes to travel from San Jose to the location of the stop], especially energy drinks."  Tr. 33.  ECF

17    No. 77 at 8.  The government contends the following indicators further raised Gunsauls' concerns

18    as the stop progressed: (1) Cornejo continued to argue with Gunsauls about his speed, even

19    though Gunsauls told him several times that he only intended to give Cornejo a warning;

20    (2) Cornejo's nervousness appeared to increase over time; (3)  Cornejo delayed slightly before

21    answering where Toppenish is located; and (4) Cornejo could not explain why the rental

22    agreement said "California only" when he intended to return the car in Washington.  *Id.* at 9.  The

23    government argues these seven factors, taken together, gave Gunsauls an independent, reasonable

24    suspicion of criminal activity.  *Id.* at 9–10.

25                 The result of a reasonable suspicion analysis "depends in part on whether the

26    district court finds the officers' testimony concerning the relevant facts credible, and in part on

27    whether the information [available to the officers] provided reasonable suspicion justifying

28    the . . . delay."  *Evans*, 786 F.3d at 789.  Here, the court finds Gunsauls' explanations of his

1    actions in connection with the stop are not fully consistent with the record developed before the

2    court.  As noted above, the dashboard video appears to belie Gunsauls' statements that Cornejo

3    "was impacting other traffic on the roadway" in any meaningful way, Tr. 30–31, and that other

4    cars were "passing [him] on the wrong side of the road," Vid. 9:09:28–9:09:39, 9:22:30–9:22:49.

5    Moreover, Gunsauls testified he was "sixty percent certain" Cornejo was involved in drug

6    smuggling by the time he first returned to his patrol car, Tr. 38–39, but he did not "diligently

7    pursue[] a means of investigation that was likely to confirm or dispel [his] suspicions quickly,"

8    *Sharpe*, 470 U.S. at 686.  Although Gunsauls testified that the rental agreement appeared

9    suspicious and not "legitimate," Tr. 45–46, he did not call Enterprise or ask dispatch to do so, *see*

10   Tr. 121–22, 149; neither did he ask Cornejo about the agreement.  Gunsauls testified that the

11   empty beverage containers raised suspicions of smuggling, Tr. 33–34, 51–54, 175–77, but he

12   never asked Cornejo about the containers.  He did not conduct the K-9 sniff of the rental car until

13   approximately twenty minutes had passed, even though Hughes had arrived at the scene eight

14   minutes into the stop.  After Gunsauls and Hughes compared notes for four minutes after Hughes

15   arrived, Hughes could have filled out the warning citation while Gunsauls conducted the K-9

16   sniff.

17          Gunsauls' selective muting of the audio recording raises additional questions.

18   Gunsauls testified that he turned off his microphone for "officer safety reasons," Tr. 28, and to

19   withhold law enforcement's tactics from criminals, Tr. 164–66, 179–80.  This explanation does

20   not comport with muting the audio during the K-9 sniff or search of the sedan.  Vid. 9:28:35–

21   9:30:41.  The selective muting here could have omitted Hughes' questioning unrelated to the

22   traffic mission, sounds undermining the reliability of the K-9 alert, or information being

23   volunteered by the defendant that dispels suspicions.

24          Even accepting Gunsauls' account in full, the evidence does not establish a

25   reasonable suspicion of drug-related activity prior to Gunsauls' unrelated questioning or the K-9

26   sniff.  Traveling on the northbound side of I-5 is the type of overbroad categorization the court

27   rejected in *Montero-Camargo*, 208 F.3d at 1129, 1131–32.  Similarly, although nervousness is

28   relevant, it "carr[ies] little weight," "because many citizens become nervous during a traffic stop,

1    even when they have nothing to hide." *United States v. Evans*, 122 F. Supp. 3d 1027, 1035 (D.

2    Nev. 2015) (citation omitted) (finding signs of nervousness and willingness of the defendant to

3    change his story insufficient to establish reasonable suspicion).  Although Cornejo shifted his

4    weight and bit his lip while conversing with Gunsauls in front of his patrol car, the video does not

5    show that Cornejo's nervousness substantially increased over the course of the stop.  *See, e.g.*,

6    Vid. 9:23:34, 9:24:23–9:24:26, 9:26:35; *see* Tr. 53–54; Rep. 3.  After being instructed to exit his

7    car, approximately thirteen minutes after the initial stop, Cornejo did twice make comments that

8    questioned the basis for the stop and asked why Gunsauls "picked" his car.  Vid. 9:22:08–

9    9:22:39, 9:25:20–9:26:31.  However, his tone was conversational, and his behavior under the

10   circumstances did not provide an objective basis for suspecting drug smuggling, as opposed to

11   genuine frustration at being pulled over and a desire to explain his viewpoint.   Cornejo's

12   nervousness alone in this case is insufficient to justify continued detention.  *See United States v.*

13   *Chavez–Valenzuela*, 268 F.3d 719, 726 (9th Cir. 2001), *amended*, 279 F.3d 1062 (9th Cir. 2002),

14   *abrogated on other grounds by Muehler v. Mena*, 544 U.S. 93 (2005).

15            Other courts have given varying weight to the presence of energy drinks or fast

16   food wrappers, which are consistent with innocent travel but could also indicate long-distance,

17   hurried travel, depending on the presence of other circumstances that can support reasonable

18   suspicion.  *Compare United States v. Beck*, 140 F.3d 1129, 1136–40 (8th Cir. 1998) (no

19   reasonable suspicion of drug smuggling where defendant was driving a rental car that had been

20   rented by an absent third party, defendant was stopped in Arkansas but traveling from California,

21   there was fast food trash on the passenger side floorboard, and no visible luggage, defendant

22   appeared nervous, and the officer did not believe defendant's reason for his travels), *United States*

23   *v. Wendfeldt*, 58 F. Supp. 3d 1124, 1133–35 (D. Nev. 2014) (no reasonable suspicion where

24   officer observed "uncontrolled shaking" by defendant; trash, clothing, and miscellaneous items

25   were scattered throughout the car; defendant provided vague and indefinite travel plans; and

26   defendant disclosed prior DUI conviction but not prior misdemeanor drug charge), *and United*

27   *States v. Mora-Morales*, 807 F. Supp. 2d 1017, 1023 (D. Kan. 2011) (no reasonable suspicion of

28   drug smuggling where one defendant appeared nervous, there were two air fresheners and an

1    unopened package of energy drinks in the car, defendants wore new clothes, the vehicle

2    registration was recent, and officer knew Washington is a source state for drugs), *with United*

3    *States v. Bradford*, 423 F.3d 1149, 1157 (10th Cir. 2005) (noting that food wrappers strewn about

4    a car do not by themselves indicate drug smuggling, but finding reasonable suspicion based on

5    totality of circumstances), *and United States v. Bowman*, No. 15-101, 2016 WL 3621283, at *8

6    (W.D.N.C. May 31, 2016), *report and recommendation adopted*, 2016 WL 3617963 (July 5,

7    2016) (large suitcase with loose clothes, energy drink, food, and food wrappers were sufficient to

8    suspect defendant was lying in light of his statement that he was just picking up passenger from

9    his girlfriend's house).  As noted above, the Ninth Circuit has recognized that innocent factors,

10    taken together, may warrant further investigation.  *Valdes-Vega*, 738 F.3d at 1078.

11          Here, the empty beverage containers and handwritten rental agreement are wholly

12    consistent with innocent travel, and under the totality of the circumstances, do not raise

13    reasonable suspicion of criminal activity.  *See, e.g.*, *Beck*, 140 F.3d at 1138 ("[T]he mere presence

14    of fast-food wrappers in the Buick is entirely consistent with innocent travel such that, in the

15    absence of contradictory information, it cannot reasonably be said to give rise to suspicion of

16    criminal activity." (citations omitted)).  The rental agreement showed that Cornejo had rented the

17    vehicle the previous morning, twenty-two hours before the stop, Ex. 5, and Gunsauls believed

18    San Jose was approximately six hours' driving time from the traffic stop location, Tr. 33.

19    Gunsauls did not eliminate the possibility others had been in the sedan and had contributed to the

20    collection of bottles.  Cornejo himself may have been thirsty or tired since renting the car.

21          With respect to the rental agreement, an Enterprise employee testified that the

22    company's standard operating procedure when the computer system goes down is to handwrite

23    the information onto the rental contract.  Tr. 214, 216–17.  When Gunsauls ran the license plate

24    on the rental car, there were no reports it was lost or stolen, consistent with this innocent

25    explanation.  Tr. 47, 147, 149, 229.

26          Any gaps or inconsistencies regarding Cornejo's travel plans and the phrase "CA

27    only" on the rental agreement were not so significant as to arouse genuine suspicion.  *See United*

28    *States v. Simpson*, 609 F.3d 1140, 1150 (10th Cir. 2010) ("[B]y themselves, these fairly minor

1     evasions and inconsistencies would not constitute reasonable suspicion . . . .").  "Mere 'uneasy

2     feelings' and inconsistent stories . . . do not constitute articulable facts that support a reasonable

3     suspicion of drug trafficking."  *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006).

4     Cornejo provided a Washington driver's license and said he was driving home to Washington

5     after visiting his parents in San Jose for a few days.  Vid. 9:10:10–9:10:35.  He explained that he

6     decided to drive a rental car back to Washington because his own car was not in good condition.

7     Vid. 9:24:30–9:25:12; Rep. 3.  This story is plausible.  In the video of the exchange, Cornejo's

8     slight delay in describing where the city of Toppenish is located objectively did not support a

9     reasonable suspicion of drug smuggling.  Vid. 9:23:44–9:24:06.  In the Investigative Report,

10     Gunsauls wrote he "believed Jairo was lying to [him] and his story was not making sense,"  Rep.

11     3, but mere hunches or "uneasy feelings" are not enough to support a reasonable suspicion of

12     drug trafficking.

13           In sum, Cornejo appeared somewhat nervous, had empty beverage containers in

14     his car, had a pre-printed rental agreement form with handwritten entries, and did not fully

15     explain the "CA only" note to Gunsauls' satisfaction.  He provided a valid driver's license, had

16     no outstanding warrants, did not have any weapons on him, did not engage in any threatening

17     behavior, and his rental car was not reported lost or stolen.  The problem is not just that Gunsauls

18     relied on an overly broad profile in forming his suspicion, but that he also did not promptly

19     investigate to confirm or dispel his suspicions.  Gunsauls was "sixty percent" certain Cornejo was

20     smuggling drugs when he first returned to his patrol car, Tr. 38–40, but he did not investigate the

21     validity of the rental agreement, inquire about the empty beverage containers, or conduct the K-9

22     sniff immediately upon Hughes' arrival.  Tr. 38–40.  Considering the factors identified by the

23     government in totality, and having carefully reviewed Gunsauls' narrative and the dashboard

24     video, the court concludes the prolongations were not justified.  While it would be tempting when

25     officers' conduct uncovers contraband, such as a substantial quantity of drugs, to allow the end to

26     justify the means, the court "must resist such temptation."  *United States v. Richardson*, 385 F.3d

27     625, 631 (6th Cir. 2004) (affirming suppression of handgun seized after traffic stop); *see also*

28     *Weeks*, 232 U.S. at 392–93.  The deputies in this case unnecessarily prolonged the stop to ask

1  unrelated questions and conduct a K-9 sniff of the sedan without the constitutionally required

2  independent, reasonable suspicion of criminal activity.

3       B.    Good-Faith Exception to Exclusionary Rule

4       Having found the deputies violated Cornejo's Fourth Amendment rights, the court

5  next determines whether suppressing the evidence seized as a result is the appropriate remedy.

6  *See Davis*, 564 U.S. at 243–44.  At the end of the government's post-hearing brief, it briefly

7  argues for application of the good-faith exception to the exclusionary rule, citing *Illinois v.*

8  *Caballes*, 543 U.S. 405 (2005).  ECF No. 77 at 10.

9       In *Caballes*, one officer conducted a K-9 sniff of the defendant's vehicle during a

10  legitimate traffic stop while another officer wrote out a warning ticket.  543 U.S. at 406.  The

11  entire stop lasted less than ten minutes.  *Id.*  The Supreme Court first explained that "[a] seizure

12  that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful

13  if it is prolonged beyond the time reasonably required to complete that mission," *id.* at 407, but

14  "accept[ed] the state court's conclusion that the duration of the stop . . . was entirely justified by

15  the traffic offense and the ordinary inquiries incident to such a stop," *id.* at 408.  The Court next

16  held that the use of the drug-detection K-9 did not in itself violate the defendant's Fourth

17  Amendment rights or convert the otherwise lawful traffic stop into an unlawful seizure.  *Id.*

18  at 408–10.  The Court reasoned that the dog sniff was not a "search" that implicated the

19  defendant's legitimate privacy interests under the Fourth Amendment, because a dog sniff of the

20  exterior of a car "does not expose noncontraband items that otherwise would remain hidden from

21  public view."  *Id.* at 409.

22       But the good-faith exception does not apply here, because *Caballes* did not permit,

23  much less "specifically authorize," the conduct of Gunsauls and Hughes.  *See Thomas*, 726 F.3d

24  at 1095; *see also Lara*, 815 F.3d at 613.  Whereas the duration of the traffic stop in *Caballes* was

25  not extended beyond the time reasonably required to complete that traffic mission, the deputies'

26  questioning of Cornejo and the K-9 sniff here did unnecessarily prolong the stop.  *Caballes*

27  limited its holding to dog sniffs conducted during lawful seizures; it did not authorize dog sniffs

28  or other unrelated tasks after the time justified by a lawful seizure.  *See Caballes*, 543 U.S. at 407.

The Court in *Caballes* specifically noted, "The question on which we granted certiorari is narrow: 'Whether the Fourth Amendment requires reasonable, articulable suspicion to justify using a drug-detection dog to sniff a vehicle during a legitimate traffic stop.'" *Id.* (internal citation omitted). It emphasized that in the case "the dog sniff was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation." *Id.* at 409. It drove the point home in saying, "A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment." *Id.* at 410.

This case also is distinguishable from the decision on remand in *Rodriguez*, *supra*, in which the Eighth Circuit applied the good-faith exception. 799 F.3d 1222 (8th Cir. 2015), *cert. denied*, 136 S. Ct. 1514 (2016). On remand, the Eighth Circuit held the officers in that case had reasonably relied on binding Circuit precedent, which "provided that a brief delay to employ a drug dog did not constitute an unconstitutional seizure, as long as the traffic stop was not unreasonably prolonged." *Id.* at 1223. The court reasoned, "The magistrate judge, the district court, and this court had all determined that the seven- or eight-minute delay . . . constituted a *de minimis* intrusion on Rodriguez's personal liberty and that Rodriguez's seizure was lawful under our then-binding precedent," which "repeatedly [had] upheld dog sniffs that were conducted minutes after the traffic stop concluded." *Id.* at 1223–24 (citation omitted). Thus, "the circumstances of Rodriguez's seizure fell squarely within [the Circuit's] case law." *Id.* at 1224. Here, by contrast, the government identifies no similar Ninth Circuit case law authorizing *de minimis* prolongations to traffic stops, and the court has found none. As explained above, *Caballes* does not authorize a *de minimis* prolongation to conduct a dog sniff. *See* 543 U.S. at 407. The Ninth Circuit in *Turvin* did undertake a somewhat similar analysis to the Eighth Circuit's application of a *de minimis* exception. *See* 517 F.3d at 1103–04 (concluding officers did not need independent, reasonable suspicion to briefly pause the stop to ask questions unrelated to the traffic purpose because the questions "did not unreasonably prolong the duration of the stop"). However, the *Turvin* court stated it "d[id] not pass upon [the Eighth Circuit's] adoption of a *de minimis* exception justifying brief questions." *Id.* at 1102. Moreover, the facts in *Turvin* are

1   distinguishable from this case, and the government here did not cite *Turvin* or any other Ninth

2   Circuit precedent.  The government has not identified any binding, pre-*Rodriguez* precedent that

3   specifically authorizes the conduct of Gunsauls and Hughes during the traffic stop here.

4           The good-faith exception announced in *Davis* does not apply to the circumstances

5   of this case.  Suppressing the challenged evidence serves the exclusionary rule's deterrent

6   purpose, because it will have the effect of discouraging officers from delaying a traffic stop to

7   fish for evidence of criminal activity based on a hunch or a broadly generalized profile.  *See*

8   *Brown v. Illinois*, 422 U.S. 590, 605 (1975) (excluding evidence where detectives' actions were

9   purposefully calculated to procure evidence).  Put another way, exclusion in a case such as this

10  will give officers an "incentive to err on the side of constitutional behavior," *Johnson*, 457 U.S.

11  at 561.  Because the deterrent value of excluding the evidence outweighs the social costs of

12  suppression, suppression is the appropriate remedy for the violation of Cornejo's Fourth

13  Amendment rights.

14  V.      CONCLUSION

15          For the foregoing reasons, defendant's motion to suppress physical evidence

16  seized and statements made on December 13, 2014 following a traffic stop is GRANTED IN

17  PART, as follows.  The court suppresses the following evidence:

18              (1) three bundles of suspected methamphetamine, weighing 3,028.6 grams

19                  (booked as D100);

20              (2) three bundles of suspected heroine, weighing 2,218 grams (booked as D101);

21              (3) $5,000 bulk U.S. currency (booked as C100);

22              (4) two LG cell phones (booked as M100);

23              (5) the Enterprise rental agreement and receipts (booked as M101);

24              (6) the GPS unit from the sedan; and

25              (7) any other evidence recovered from the sedan.

26  *See Wong Sun*, 271 U.S. at 484; *Shetler*, 665 F.3d at 1157 (the exclusionary rule applies to

27  statements and physical evidence obtained as a result of an illegal search).  The court also

28  excludes any statements made by Cornejo after the stop was unlawfully prolonged, when

1  Gunsauls began questioning Cornejo and filling out the written warning citation approximately

2  thirteen minutes after the initial stop, Vid. 9:22:04.  The court DENIES the motion with respect to

3  any statements made by Cornejo before the unlawful prolongation.

4          IT IS SO ORDERED.

5  DATED:  July 21, 2016.

7  _____
   UNITED STATES DISTRICT JUDGE

30